## City of Chicago v. Richard F. Conway.

### Gen. No. 13,554.

1. JUDGMENT—*what obviates error in rendering, in excess of the ad damnum.* Any error in rendering judgment in excess of the amount fixed by the *ad damnum* is obviated by a stipulation under which the case was tried to the effect that the plaintiff might have the same benefit of *all* claims and causes of action, appearing from the statement of facts, that he might have, if said causes of action were specially pleaded in appropriate special counts.

2. LOCAL IMPROVEMENTS—*to what extent municipality liable to contractor.* A municipality as a trustee and bailee of a special assessment fund is directly liable to a contractor who has constructed the improvement for which the fund was collected to the amount of the obligations held by him against the municipality, if the fund in the hands of such municipality, out of which said obligations

City of Chicago v. Conway.

are by their terms to be paid, is actually in its hands or is constructively, in the purview of the law, so in its hands.

3. LOCAL IMPROVEMENTS—*what not collection by municipality of amount assessed.* The amount assessed against property for a local improvement is not deemed to have been collected where such property becomes delinquent and, in default of other bidders, is bought in by the municipality—the contract between the municipality and the contractor containing a clause as follows:

"In case the city of Chicago should become the purchaser of any special assessment certificate at any sale for the delinquent special assessments in default of other bidders, such purchase shall not be deemed a collection of such special assessment, and no act of the city done or suffered shall be construed as a collection of any special assessment or part thereof, until the money due thereon shall be actually paid into the city treasury."

4. LOCAL IMPROVEMENTS—*when illegal abatements upon, chargeable against municipality in favor of contractor.* Abatements by the municipality, although made in good faith, if upon an erroneous view of the law, are illegal, and the amount thus paid out is chargeable against the municipality, and in favor of the contractor, notwithstanding a clause in the contract between such municipality and contractor in words as follows:

"No act of the city done or suffered shall be construed as a collection of any special assessment or part thereof until money due thereon shall be actually paid into the city treasury."

5. LOCAL IMPROVEMENTS—*when municipality chargeable with interest upon fund subject to claim of contractor.* The municipality is chargeable with interest in favor of a contractor where (1) there is an express agreement, (2) money has been wrongfully obtained, and (3) money is illegally withheld.

Assumpsit. Appeal from the Circuit Court of Cook county; the Hon. GEORGE A. CARPENTER, Judge, presiding. Heard in this court at the March term, 1907. Affirmed on *remittitur.* Opinion filed January 13, 1908. January 13, 1908, order of January 13, 1908, vacated by consent. January 20, 1908, reversed and judgment here for $18,475 in favor of appellee.

GEORGE A. MASON and LYMAN, LYMAN & O'CONNOR, for appellant; EDWARD J. BRUNDAGE, Corporation Counsel, of counsel.

TOLMAN, REDFIELD & SEXTON, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

The appellee recovered judgment in the Circuit

Court of Cook county February 4, 1907, against the appellant for $20,176.17. This judgment was entered on a finding by the trial judge, by whom the cause was heard without a jury on a stipulation of facts entered into by the parties. The essential facts shown in this stipulation will appear in this opinion. The suit was in *assumpsit* and the declaration on the common counts, to which the general issue of *non-assumpsit* was pleaded, but by the stipulation on which the case was tried it was agreed that under the common counts and general issue each of the parties to the cause might have the same benefit and advantage of all claims, causes of action and defenses appearing from the statement of facts as though said causes of action and defenses were specially pleaded in appropriate special counts and special pleas in an action of *assumpsit*. This agreement we think eliminates from the case the alleged error of the court in rendering judgment for an amount exceeding the *ad damnum*. It is not necessary to pass on the question whether the order giving the plaintiff leave to amend the declaration and the additional record filed in this court showing an amended declaration are sufficient in themselves to obviate the objection made to the judgment by the defendant in this regard, or on the question whether the assignments of error made by the defendant are sufficient to cover it. The stipulation is that the plaintiff may have the same benefit of *all* claims and causes of action appearing from the statement of facts that he might have if said causes of action were specially pleaded in appropriate special counts. An "appropriate special count" which covered all the claims or causes of action which the plaintiff might have, would conclude with an *ad damnum* sufficiently large to cover them. It is by no means true that a special and individual count is necessarily without a conclusion of an *ad damnum*. On the contrary, each count must state a cause of action in itself and logically may and should be completed by the *ad damnum* clause. It is for convenience and brevity that the *ad*

*damnum* clause is generally placed only at the end of a declaration of several counts and made to refer back to each of them. This technical objection, therefore, to the judgment appealed from, may be disregarded.

The material facts of the controversy are these: The plaintiff is the owner of all the unpaid and outstanding vouchers and special assessment bonds issued as hereinafter set forth on account of a certain improvement ordered by the city council of Chicago on June 16, 1896, under the special assessment laws then in force. The improvement was for the paving of a system of streets known as the St. Lawrence avenue system. The special assessment in question was confirmed by the County Court of Cook county as Docket No. 21,165. The plaintiff was the contractor for the construction of said improvement, and the vouchers provided for by the law for a portion of the contract price and the bonds for the remainder were all delivered to him. Their form and tenor will be hereafter described. The larger portion of them has been paid, but it is stipulated that the amount due on said outstanding vouchers and bonds, for interest and principal, according to the terms thereof, on January 31, 1907, after crediting all payments made on account of them, was $20,176.17, which is the amount of the judgment in this cause rendered February 4, 1907. This statement, however, is subject to a qualification hereinafter noted.

The suit was not brought nor did the judgment go against the city on the ground that the vouchers and bonds were, when issued, the absolute obligations of the city. It is conceded by the plaintiff that they were not.

The law in force concerning them when they were issued was this: The aggregate amount of any assessment against property and each individual assessment could be by ordinance (and was in this case) divided into seven installments equal in amount, except that all fractional amounts were to be added to the first installment, so as to leave the remaining installments

of the aggregate equal in amount and each a multiple of $100. All installments except the first bore interest at the rate of six per cent. per annum. For the purpose of anticipating the collection of the second and subsequent installments, the city might issue bonds (as it did in this case) in sums of any multiple of $100, payable out of said installments and bearing interest not to exceed six per cent. per annum, payable annually.

The form of the bond should be as is shown in Exhibit B attached to the stipulation of facts in this case.

"UNITED STATES OF AMERICA.

STATE OF ILLINOIS.

Bond          COUNTY OF COOK.         Series
No. E. 1494                               No. 4.

CITY OF CHICAGO.

IMPROVEMENT BOND.

The City of Chicago, in Cook County, Illinois, for value received, promises to pay to bearer on the thirty-first of December, A. D. 1901, the sum of One Thousand Dollars with interest thereon from date hereof at the rate of six per centum per annum, payable annually on presentation of the coupons hereto annexed. Both principal and interest of this bond are payable at the office of the Treasurer of said City of Chicago.

This bond is issued to anticipate the collection of a part of the fifth instalment of special assessment No. 22344, levied for the purpose of improving St. Lawrence Avenue System, which said instalment bears interest from the 23rd day of August, A. D. 1896, and this bond and the interest thereon are payable solely out of said instalment when collected.

Dated this 20th day of July, A. D. 1897.

CARTER H. HARRISON, Mayor,

L. E. McGANN,

Commissioner of Public Works.

Countersigned:

     R. A. WALLER,

         City Comptroller.

Attested:

     WM. LOEFFLER,

         City Clerk."

The bonds, it was provided by law, might have coupons attached to represent the interest to accrue thereon, and in the present case the form of the coupon is given by the stipulation by the following example:

"THE CITY OF CHICAGO

Coupon No. E. 1238                              $60.00.

Promises to pay bearer at the office of the City Treasurer in said City on the 31st day of December, 1902, the sum of sixty dollars, being the annual interest on improvement bond No. E. 1238, Series No. 6, dated May 17, 1897, issued in anticipation of the collection of the seventh deferred instalment of special assessment No. 22344 named in said bond, said sum to be paid solely out of the fund levied for such purpose when collected.

R. A. WALLER,

City Comptroller."

The payment for any improvement might be made in these bonds, and the first installment of the assessment levied for it was to be applied in this manner. From the amount of the first payment when it should be collected, should first be paid all the costs of making the assessment, including court costs. The remainder of said payment might then be paid to the person entitled thereto on the contract for said work; if not collected when payments fell due, vouchers therefor might be issued payable out of said first installment when collected. Said voucher was to bear no interest.

There were these two following provisions also in the law which came into force July 1, 1897.:

"No person or persons or bodies corporate taking any contracts from the city  *  *  *  and agreeing to be paid out of special assessments" (as was the case of the plaintiff here)  *  *  *  shall have any claim or lien upon the city  *  *  *  in any event except from the collection of special assessments  *  *  * made or to be made for the work collected for, but the municipality shall cause collections and payments to be made with all reasonable diligence. And in such case, if it shall appear that such assessment  *  *  *

cannot be levied or collected, the municipality shall not nevertheless be in any way liable to such contractor or contractors in case of failure to collect the same, but shall so far as it can legally do so, with all reasonable diligence, cause a valid special assessment or assessments * * * to be levied and collected to defray the cost of said work until all contractors shall be fully paid, and any contractor shall be entitled to summary relief of *mandamus* or injunction to enforce the provisions hereof.''

"No person or persons accepting the vouchers or bonds as provided herein shall have any claim or lien upon the city * * * in any event for the payment of such vouchers or bonds or the interest thereon, except from the collections of the installment for which said vouchers or bonds are issued, but the municipality shall not nevertheless be in any way liable to the holders of said vouchers or bonds in case of failure to collect the same, but shall with all reasonable diligence, so far as it can legally do so, cause a valid special assessment or assessments * * * to be levied and collected to pay said bonds and vouchers until all bonds and vouchers shall be fully paid. Any holder of vouchers or bonds or their assigns shall be entitled to summary relief by way of *mandamus* or injunction to enforce the provisions hereof.''

While these exact words were inserted first in an Act of June 14, 1897, which practically codified and made consistent former legislation on the subject, yet the provisions in the former acts of April 29, 1887, June 15, 1891, and June 17, 1893, were to the same effect and placed upon the city of Chicago no greater and no less obligations in regard to the vouchers and bonds in question. So that whether they are governed in these respects by the law in force when the assessment was ordered and confirmed, or by that when they were issued, makes no difference to the questions raised here.

The instruments themselves are not the obligations

of the city, but rather of the property owners, who by law are held to pay the assessment which constitutes the fund out of which they are to be paid and on which they are a charge. But the city has obligations connected with them to their owners and holders. By a violation of those obligations it may undoubtedly make itself directly liable to such holders. It is also a trustee and bailee of the fund so raised, and by a violation of its duties in that capacity may render itself directly liable to the holders of the instruments.

It is on the ground of such a violation of its obligations and duties that the present suit was brought and that the judgment was obtained below.

The claim of the plaintiff is this: The city council duly awarded to appellee as the lowest and best bidder the contract to do the work in this public improvement for $104,162.65, payable out of the proceeds of a special assessment. The appellee completed the improvement to the satisfaction of the city and received vouchers and bonds for the amount of the contract to the principal sum of $104,162.65. The city ordered the special assessment and received on it, according to its own computations, $136,545.53, of which $32,382.88 was interest on the principal of the various installments. It paid at various times to the appellee, as shown by the summary from the comptroller's books attached to the stipulation of facts, on account of the principal, $101,697.63. Of this amount, as the stipulation in its body, in connection with the summary, shows, $44,837.07 was paid for the retirement in full (apparently with $400 of coupons—at all events there is a discrepancy of $400) of instruments aggregating in the principal $44,437.07, and the balance of $56,-860.56 was paid at various times on account of the principal of outstanding vouchers and bonds now in the hands of the plaintiff, as more particularly hereafter detailed.

Besides the $101,697.63 of principal thus paid to the plaintiff, the summary from the comptroller's books

shows the following charges, which we suppose refer to payments to the contractor of interest on the instruments which were retired in full and cancelled:

| | |
|---|---|
| Interest, | $18,113.42. |
| Interest Warrant B, | 141.27 |
| | $18,254.69. |

This, added to $101,697.63, would give $119,952.32, paid to the contractor for principal and interest.

The further charges against the fund in the comptroller's books are these, which will enter into the discussion of this case:

| | |
|---|---|
| Cost, | $9,880.09, |
| Excess abatements and Refunds, | 5,251.18, |
| Tax certificates, | 481.97. |

The aggregate of these charges is $14,613.24, which, added to the sum paid to the contractor, makes $135,565.56. Charged against the "Cash Receipts," which the summary of the comptroller's books credits to the fund, this amount leaves a balance on those books only of $979.97, which is all that the appellant admits is due from it on the instruments held by the appellee, because all that is properly in its hands to pay. As hereinafter noted, however, it contends that if this is not all that it holds in the fund from which these instruments are payable, it is chargeable at worst with a much less amount than that claimed by appellee.

The instruments which are outstanding in the hands of the appellee are:

| | | |
|---|---|---|
| A voucher for | $5,325, | due July 24, 1899; |
| Bonds to the principal amt. of | 11,200, | due Dec. 31, 1900; |
| Bonds to the principal amt. of | 12,000, | due Dec. 31, 1901; |
| Bonds to the principal amt. of | 15,600, | due Dec. 31, 1902; |
| Bonds to the principal amt. of | 15,600, | due Dec. 31, 1903. |
| Total, | $59,725. | |

On this principal sum of $59,725 there has been paid

City of Chicago v. Conway.

at various dates shown in an exhibit attached to the stipulation of facts, between December 31, 1903, and the beginning of this suit, $56,860.56, the last payment having been made on January 1, 1905. This leaves due on the principal sum $2,865, and also on account of interest as claimed by appellee:

First: The interest coupons on the bonds, which were all outstanding on them Dec. 31, 1903. These amounted on October 31, 1906, with the interest on them provided for by their terms (according to a computation stipulated to be correct), to........................ $6896.16.

Second: Interest accruing on the non-interest bearing voucher *after* its maturity on July 24, 1899, the partial payments being taken into account as reducing from time to time the principal sum on which interest is calculated. This amounted (also according to the computation stipulated to be correct), October 31, 1906, to............................. $1699.25.

Both these items of interest are, however, evidently calculated at 6 per cent, although neither coupons nor voucher specified any rate of interest before or after maturity—a matter hereafter to be further noted.

Third: Interest accruing on the principal of the bonds after their maturity, and the consequent absence of coupons, taking into account the partial payments by which the principal was reduced. The bonds bear interest at 6 per cent after date, and the interest is computed at that amount and stipulated to be correctly calculated. This amounted Oct. 31, 1906, to............................. $8417.91.

These items of principal and interest to Oct. 31, 1906, make in the aggregate....$19,878.32.

Upon this amount was calculated in the claim of the appellee and allowed

by the Court in the judgment appealed
from, interest at 6 per cent for the three
months from Oct. 31, 1906, to Jan. 31,
1907, amounting to............................................     297.85,

which makes the aggregate for which
judgment was rendered on Feb. 4, 1907, $20,176.17.

The stipulation of facts contains, indeed, as its eighth
clause, the statement that: "The amount now due upon
said vouchers and bonds for interest and principal ac-
cording to the terms thereof, after crediting thereon
all payments made on account as aforesaid, is $20,-
176.17." This, however, taken in connection with the
exhibits which are practically made a part of the stipu-
lation, is subject to the facts noted above—that in
reaching this amount interest has been calculated at
six per cent. after maturity on a voucher and on cou-
pons which name no rate, and that interest on interest
at six per cent. has been charged from October 31,
1906, to January 31, 1907.

The stipulation of facts recites that "at the date of
maturity of each of said vouchers, bonds and coupons,
and again just prior to the bringing of this suit, the
plaintiff demanded of the financial officers of the city
that they pay said vouchers, coupons and bonds, but
the city has failed and refused to pay the same or any
part thereof."

The grounds of this demand and of this suit are
threefold and are connected respectively with the three
charges heretofore noted as made against the fund in-
volved for (a) "costs," (b) "excess, abatements and
refund," (c) tax certificates.

In the dealings of the city with the fund which were
the basis of each of these charges, it is claimed by
the appellee that the city made itself, on more than
one ground, directly liable for certain amounts to him
as the holder of outstanding obligations against the
fund.

He claims also that in each case the city was, not

only at the time this suit was begun, liable to him for the amount of the various sums in the first instance improperly diverted from, or properly to be credited to said funds; but also (up to the amount due on the obligations held by him) for interest on those sums from the time they were so improperly diverted or withheld from said fund to the time the suit was brought. In other words, he claims that the fund which should be considered in the city's hands liable for the payment of his obligations with interest as heretofore detailed should be increased from $979.97, shown by the comptroller's books, by various additions of diverted sums and interest thereon, which diverted sums the city should, in the performance of its duties as trustee, have placed and left in said fund, but did not—to an amount computed by him at $22,166.77— a sum more than sufficient to answer the claim on the obligations made by him of $20,176.17.

We note here, however, that we feel ourselves at liberty, under the stipulation of facts and its exhibits attached, to revise and correct the computation of interest on each side of this account, to make them accord with our view of the rights involved.

We are of the opinion that the city, as trustee and bailee of this fund, is directly liable to the appellee up to the amount of the obligations held by him, if the fund in its hands out of which said obligations are by their terms to be paid is actually in its hands or is constructively in the purview of the law so in its hands. If the city ought in law, in consideration of its duties as trustee, bailee, agent, depositary, or otherwise, of the fund for the contractor and obligation holder, and of its neglect or violation of those duties, to be charged with certain sums which should belong to and go into that fund, then for those amounts, as well as for that admitted by it to be in its hands (up, of course, only to the sum of the obligations belonging to the contractor, correctly computed), we deem it answerable to said contractor in this action for money had and

received—widened also as it is by the stipulation that
the plaintiff may have the same benefit and advantage
of all claims, causes of action and defenses appearing
from the statement of facts as though said causes of
action were specially pleaded in appropriate special
counts in an action of *assumpsit*.

We shall take up each of the items of wrongful diver-
sion or withholding alleged, therefore, and discuss
what, if anything, should be added on account thereof
to the $979.97 admitted now to be in the hands of the
city belonging to the fund. But this we shall do, for
convenience, in the inverse order of their previous
mention.

It is claimed, as we have indicated, that the charge
to the fund for "tax certificates" of $481.97 was un-
warranted, and the amount should be added to the
fund. We think this clearly an unfounded contention.
It is argued by appellee, as we understand his conten-
tion, that inasmuch as the stipulation of facts recites
that there were no bidders when certain lots, against
which the assessment had been certified to the county
treasurer for collection, were offered for sale, it is to
be understood that there was no sale, but that the city
canceled the assessment on the consideration simply
of bookkeeping entries on the county collector's and
on the city's books, and that this did not relieve the
city from the obligations it would have been under to
the plaintiff had the warrants been collected as to these
lots. We think this too technical and narrow a view
of the matter. The contract of the city with the ap-
pellee itself provided:

"In case the city of Chicago should become the pur-
chaser of any special assessment certificate at any sale
for the delinquent special assessments in default of
other bidders, such purchase shall not be deemed a
collection of such special assessment, and no act of the
city done or suffered shall be construed as a collection
of any special assessment or part thereof, until the
money due thereon shall be actually paid into the city
treasury."

Any reasonable construction of this provision puts out of the question involved here anything relating to these tax certificates and the charge therefor, and it is unnecessary to inquire into the discrepancy between the "$902.39," said in the body of the stipulation of facts to be represented by tax certificates and tax deeds, and the "$481.97" only, charged on the comptroller's books against the gross receipts, which are made also to include this sum.

Another item claimed by the appellee to have been wrongfully charged to the fund is that which appears on the books of the comptroller under the titles, "Excess, Abatements and Refunds," and amounts to $5,251.18.

The stipulation of facts as to this amount shows that "the officers and agents of the city of Chicago during the years 1896 and 1897" (the dates are not more definitely stated) "voluntarily made abatements to property owners of the amounts assessed against them under the following circumstances:

After the special assessment had been confirmed by the order and judgment of the County Court of Cook county, and the amount of the benefits and of the proportionate cost of the improvement to each particular lot fronting upon the said improvement had been ascertained and confirmed by the court, the city of Chicago, by its then officers, undertook to ascertain the actual expense of constructing the pavement in front of each particular lot, and where it appeared that by reason of the physical condition of the property a less amount of filling and grading was necessary for one lot than for another, or for any reason the cost of the improvement in front of a particular lot was less than the amount assessed against it, the city of Chicago issued an abatement certificate to such property owner for the amount so ascertained and delivered the same to the county treasurer, to which officer the said assessment had then been certified for collection according to law, and directed him not to collect said amount from said

property owner, but to credit the account of said property owner with the amount of said certificate mentioned as 'paid by the city of Chicago,' and directed him, after thus crediting said abatement certificates and collecting the balance, to turn in said certificates to the city on final accounting of the collection as so much money collected. This was done after the contract for said improvement had been awarded and signed and while the improvement aforesaid was in process of construction and without any order of court or judicial proceeding to determine whether the amounts previously adjudicated by the court as the amounts of benefits and the proportionate costs of the improvement for each particular lot was excessive, and without any proceeding to charge to the other lot owners an equivalent amount.''

It is conceded, as we understand, that this action of the city was unwarranted and illegal, and inconsistent with the rule that special assessments cannot be lawfully levied on the basis of the cost per front foot of the improvement, but must be levied on the basis of the proportionate benefit which the property owner receives from the whole improvement, considered as a unit; but it is stipulated that ''This action of the city was taken in good faith and without any fraud on the part of its officers and in compliance with a theory of the law then entertained by them that an assessment should be spread and collected on the front foot basis— that is to say, according to the actual cost of constructing the improvement in front of each particular lot.''

The appellant claims that the principal amount in question, $5,251.18, was never actually received by the city, and relying on a strict construction of the last half of the clause in the contract hereinbefore recited, in discussing the tax certificates, viz.: ''And no act of the city done or suffered shall be construed as a collection of any special assessment or part thereof until the money due thereon shall be actually paid into the city treasury,'' insists that the city should not be

held to have collected or be responsible in any character for the amount of these unlawful abatements.

We have already indicated that we think the mere fact that the money is not now in its hands does not relieve the city from liability if it is through a violation of its duty only that said money, once actually or constructively collected, is not now available in the fund involved.

The effect sought to be given to the clause in question is too wide. It cannot be properly construed to be an agreement that the city should not be liable for actual future affirmative wrongful acts of its responsible officers, even if it should be held to cover neglects. Such a construction would make the contract void, as against public policy.

We think, moreover, that these amounts thus unlawfully "abated" in the manner described must be considered in law to have been actually paid into the treasury of the city and then by the city wrongfully and tortiously paid out to the various property owners who profited by the "abatements" and "refunds." There is in our mind no proper distinction between the "abatement" in this fashion and a "refund." Any fancied distinction is, at the very most, a mere matter of bookkeeping. The appellant says the abatement orders were a "nullity" in law. But they did not prove to be a nullity in fact. The city ordered the county treasurer to take them as money, the county treasurer took them and receipted for them as money and turned them into the city as money. The city, in its capacity as "trustee," "bailee," "agent" or "instrumentality," took them as money, receipted for them as money, credited them to the fund as money received, and then charged them on the other side as disbursements. We do not think the city is in a situation to claim that they were anything but unlawful and unwarranted disbursements from the fund which belonged to the obligation holder. If they were unlawful and unwarranted disbursements, they were unlawful

diversions, and if the amount of them was unlawfully diverted, it was, when demanded by the appellee from the city, unlawfully withheld from him. If these views are correct, the cases cited by the appellee, which decide that *mandamus* and not *assumpsit* is the proper action against a municipality which neglects to make a sufficient assessment to meet the cost of an improvement, do not apply and we need not discuss or distinguish them. We think the $5,251.18 must be added to the $979.97 admitted and be considered a part of the fund liable for the obligations belonging to the plaintiff.

We are brought also by these considerations to another contested question in the case, viz.: Whether, even conceding that $5,251.18 should be on this "abatement" account considered as in the fund liable to plaintiff, interest on the said $5,251.18 should be credited to said fund and made a part of it. The appellee puts forward several theories on which it is said that the city should be liable for such interest, and the trial court, it is said by appellee, calculated interest on the amount in question at the rate of six per cent. per annum for ten years, and added it to the fund to be held liable. This calculation is also the one adopted by the appellee as the proper one to be made, and in accordance therewith he claims as interest, to be added on this account to the fund, $3,150.70.

The appellant, on the other hand, argues that a municipality is not liable for interest in any event, except by express 'agreement, unless the money on which it is charged is both wrongfully obtained and illegally withheld, and that in the present case, whatever may be concluded as to its being "wrongfully withheld" after demand was made for it, or whatever may be said as to its having been "obtained" at all, it was confessedly not "wrongfully" obtained. Therefore, it is said, the city should not be in any event charged with this interest or any part of it. To these propositions are cited: Vider v. City of Chicago, 164 Ill. 354; City of Peoria v. Construction Co., 169 Ill.

City of Chicago v. Conway.

36; City of Danville v. Danville Water Co., 180 Ill. 235.

These last two cases do use the words in relation to the obligation of municipalities for interest, that they are not chargeable with it on claims against them, except where there is an express agreement, or where "money is wrongfully obtained *and* illegally withheld by them," but we think that too much emphasis should not be placed on the conjunction, and that the true meaning of the opinions is that municipalities are liable for interest in three cases—where there is an express agreement, where money has been "wrongfully obtained" by them, and where money is "illegally withheld" by them. This accords with the more precise statement in Vider v. City of Chicago, *supra,* where it is said that "The conclusion to be drawn from these decisions is that counties" (municipal corporations) "do not pay interest on their contracts, except in pursuance of an express agreement to do so, but that in actions originating in torts they are liable to the same extent as private persons."

The word torts may here be properly read as meaning tortious or illegal acts. It is evidently not a form of suit that is referred to, but the character of the act, and whether it is wrongful or not. In this case the depletion of the fund was a wrongful act, and the amounts so previously refunded to property owners were illegally withheld from its true owner, when, according to the stipulation of facts, "at the date of the maturity of each of said vouchers, bonds and coupons he demanded that they pay said voucher, bonds and coupons," and it "failed and refused to pay the same."

Moreover, the cases cited are not quite analogous to the one at bar. The obligations, the amount of which is sought to be recovered here, do bear interest by their terms, and so far as they evidence a contract of the city at all they show that the city was bound in its capacity as an "instrumentality" to conserve the fund collected to pay them.

We think that interest on a proper basis is chargeable to the city, to be credited to the fund, but it is our opinion that too much interest is claimed by the appellee.

The interest is calculated by him from January 1, 1897, to January 1, 1907, but the "abatements" are said by the statement of facts to have been made "during the years 1896 and 1897," and by Exhibit D, annexed thereto, they seem all to have been made in 1897. Therefore the calculation of interest for ten years is a calculation in any event for a part of a year too much. But this is not all that should be considered, for the abatements seem by Exhibit D, although all made in 1897, to have been distributed through each instalment—that is, a "refund" of $87.21 has no date, but abatement certificates were evidently given in 1897 for $721.27 on the first instalment and $740.45 on each of the other six. That is, abatement orders of $721.27 were given for the instalment payable in 1897 and $740.45 on each of the instalments payable respectively in 1898, 1899, 1900, 1901, 1902 and 1903.

The plaintiff holds a voucher for $5,325.56, which was payable out of the first instalment, but not until July 24, 1899; coupons to the amount of $720, payable out of the fifth instalment, due December 31, 1901; coupons payable out of the sixth instalment to the amount of $936, due December 31, 1901, and to the amount of $936, due December 31, 1902; coupons payable out of the seventh instalment to the amount of $936, due December 31, 1901, $936 due December 31, 1902, and $936 due December 31, 1903. He also holds bonds which were payable out of the fourth instalment to the amount of $11,200, due December 31, 1903, and which were then entirely unpaid; bonds which were payable out of the fifth instalment, to the amount of $12,000, due December 31, 1901, and then entirely unpaid; bonds which were payable out of the sixth instalment, to the amount of $15,600, due December 31,

1902, and then entirely unpaid; and bonds which were payable out of the seventh instalment, to the amount of $15,600, due December 31, 1903, and then entirely unpaid.

This leaves $120 in coupons due December 31, 1901, according to Exhibit A, unaccounted for, but as they cannot be placed from the data in the record, they must be disregarded in this statement. From this statement it appears that, so far as the record shows, the appellee had claims on the fund on the following respective dates for the following respective sums only, out of the respective instalments:

| From the 1st instalment, | $5,325.56, | July 24, 1899; |
| From the 4th instalment, | 11,200, | Dec. 31, 1900; |
| From the 5th instalment, | 12,720, | Dec. 31, 1901; |
| From the 6th instalment, | 936, | Dec. 31, 1901; |
| and | 16,536, | Dec. 31, 1902; |
| From the 7th instalment, | 936, | Dec. 31, 1901; |
| | 936, | Dec. 31, 1902; |
| | 16,536, | Dec. 31, 1903. |

We cannot see that any interest should begin to run in favor of the fund on account of these abatements until the appellee suffered from some default on their account. It was only then an "unlawful withholding" began. The first default that could have been made was when the voucher for $5,325.56 became due on July 24, 1899, and then as it was payable only from the first instalment, the abatements made from the other instalments did not concern it. It is true that had the other instalments not been paid by the property owners before they became due, interest on them would have been payable annually, but the property owner had a right to pay them at once upon the confirmation of the assessment, and the very theory of the appellee's claim is that he did pay them in 1897, and immediately received a refund. We think the first interest credited to the fund should be on $721.27, from December 31, 1897, to February 4, 1907 (the date of the judgment appealed from)—nearer nine years than ten—and that it should be computed not at six per

cent., but at the legal rate of five per cent. This would amount to $327.97. The next interest that should be credited should begin to run when the next default is shown, which was on December 31, 1900. Here arises a question, however, as to what amount the interest should be calculated on. Abatement certificates had been given on the second, third and fourth instalments, amounting in the aggregate to $2,221.35, but of this amount only $740.45 was of the fourth instalment, from which the default in $11,200 was made on December 31, 1900. We think, however, that as in this case no question arises between different owners of bonds payable from different instalments, that the contractor and holder of all the obligations on the assessment was entitled to payment from the fund in full before any part of it would belong or be due to any other person, and that illegal depletion of prior instalments, therefore, although the obligations specifically payable from those instalments have been met in full, should render the city chargeable with interest on such depletion from the next default.

By a later act (May 9, 1901), amending the act concerning local improvements, of June 14, 1897, section 86 of the latter act, which treats of bonds to anticipate the collection of the second and subsequent instalments, was amended. The legislature does not alter anything material in the section as it stood, except the rate of interest the bonds should bear, and did not otherwise change their prescribed form. But it made very clear the meaning of the section by adding thereto these words:

"Provided, nothing herein contained shall be construed to prevent the payment of any voucher or bond out of an instalment having a surplus to its credit other than the one against which the same is issued, the intent and meaning thereof being that in case, from any cause, the instalment against which such bond or voucher is drawn has not sufficient money to the credit thereof to pay the same, the entire amount of the assessment or any instalment thereof may be

applied toward the payment of any such vouchers or bonds issued against the assessment.''

This was a legislative construction of the section in the sense we have adopted.

Interest at five per cent. per annum on $2,221.35, from December 31, 1900, to February 4, 1907, is $676.45. There was nothing due from the fifth, sixth or seventh instalments until December 31, 1901, but on that date sums greater than the abatements made from each of those instalments in 1897 were due, and we think interest should be credited to the fund on $2,221.35, from December 31, 1901, to February 4, 1907, which is $565.08.

The aggregate amount to be added to the fund on account of these unlawful abatements is not $8,401.88, but $6,820.39.

The third and last item concerning which there is contention is thus stated in the stipulation of facts:

"On December 31, 1896, out of the money which the city collected from the property owners on said special assessment as aforesaid, the city, by its then officers in charge of the administration of special assessments, transferred from said special assessment fund warrant 22,344 the sum of $4,353.11, which the city claimed for the cost of engineering and superintendence and the cost of making and collecting said assessment, to another fund, known as Fund W. The actual cost of inspection of said improvement, $2,453.50, was also transferred to said Fund W, making an aggregate of $6,807.27 so transferred. Said sum of $6,807.27, together with six per cent. of the estimated cost of all other improvements made by special assessment during the year 1896 and several years prior and subsequent to said year were merged into said Fund W, and together constituted a single fund, from which were paid the pay-rolls of the special assessment department of the city of Chicago, including the pay-rolls of all inspectors and engineers, as well as the accountants, administrative officers, and

all other employes of said department, including the
expenses of making and collecting the assessments. No
account was kept as to the expense of making or col-
lecting any particular special assessment, nor of the
actual cost of the engineering and superintendence of
any particular special assessment. It cannot now be
ascertained what was the expense to the city of Chi-
cago of the engineering and superintendence, making
and collecting the special assessment above referred
to, nor of any other particular assessment. The
amounts thus transferred in the aggregate to 'Fund
W' were more than the total cost of administration
of the special assessment department, and the balance
of said 'Fund W' was again transferred to the general
fund of the city of Chicago and used for general cor-
porate purposes.''

''On December 31, 1896, the city, by its then officers,
also transferred from said special assessment fund the
sum of $3,072.82, and credited the same to the account
of its sewer department and used said sum of money,
together with other similar sums transferred from
other special assessment funds, in the payment of the
expenses of said sewer department, without keeping
any account of the particular amounts expended by
said sewer department on the separate and particular
special assessment improvements. The work done by
the sewer department consisted in constructing catch
basins and connecting the same with the openings in
the gutters of the streets so improved and with the
sewers in said streets underneath said pavements, so
as to provide for taking care of the surface waters
on said streets, but the special assessment ordinance
in the case in question contained no provision for the
construction or adjustment of sewers and catch basins,
and did not describe or refer to the same as a portion
of said improvement.''

''The transfers to 'Fund W' and to the sewer de-
partment as aforesaid, were made in good faith and
with a supposed lawful right so to do.''

"The original assessment proceeding above referred to was reversed on writ of error for a technical defect in the improvement ordinance (Jacobs v. City of Chicago, 178 Ill. 560), in that it did not specify the height of the curb with relation to the grade of the street. Proceedings were thereafter had for the confirmation of new assessments, and in said proceedings it was adjudicated by the County Court that the city could not include in the new special assessment, or collect from the property owners as part of the cost of the improvement, the items which had been thus diverted from the particular special assessment fund 'Warrant No. 22344' by the officers of the city of Chicago for the alleged expense of engineering, etc., amounting to $4,353.77, and for the adjustment of sewers, amounting to $3,072.82, above referred to, but that the said item for inspection, amounting to $2,-453.50, could be and was. so allowed; and the said judgment of the County Court, upon appeal to the Supreme Court of Illinois, was duly affirmed, the opinion of said court being reported in the case of Gorton v. City of Chicago, 201 Ill. 534."

The claim of the appellee as to this item is that the sums of $4,353.77 and $3,072.82, aggregating $7,-246.59, once paid by the property owners in cash, have been unlawfully diverted from the trust fund in the hands of the city belonging to him, and taken by the city and used by it for its own purposes, and that this has rendered the city directly liable for the said sums and interest thereon.

Moreover, it is urged by him that by the judicial determination in the County Court, the judgment of which was affirmed by the Supreme Court, that the deficiency made by the use of these sums could not be made up by a supplemental assessment, there has been, in effect, an adjudication that the sums in question were unlawfully used in the first instance.

The contention of the appellant is that the adjudication in the County Court is not binding in this case,

since it was between other parties, and that the two
items were necessary and legitimate expenses to charge
to the fund, that the stipulation of facts does not show
any improper disbursement of them, and should be
strictly construed. But if the fund should be consid-
ered as depleted by these amounts, yet, for further
reasons, to be noticed hereafter, appellant says no
interest on them should be charged.

As to the principal of the sums, we do not read
the stipulation of facts as do appellant's counsel. A
part of the sum in which it is claimed the fund was
depleted, viz.: $4,353.77, was, according to the said
stipulation, transferred on the books of the city to a
particular fund—"Fund W," so called—and in the
first place that fund as a whole was used for many
expenses other than the improvement in question, of
which no such account was kept that the expenses con-
nected with this special assessment and improvement
and paid from it can be ascertained. Then a balance
of the funds in the aggregate transferred to Fund W
were transferred to the general fund of the city of
Chicago and used for its general corporate purposes.
It is needless to say that a trustee cannot thus deal
with funds in its hands without becoming directly
liable for them.

As to the $3,072.82 credited to the sewer fund, it is
not only true, according to the stipulation, that the
special assessment ordinance involved in this case con-
tained no provision for the construction and adjust-
ment of sewers and catch basins, and did not describe
or refer to the same as a portion of said improvement,
but also that the appellant used said sum of money,
together with other similar sums transferred from
other special assessment funds, in the payment of
the expenses of said sewer department, without keep-
ing any account of the particular amounts expended
by said sewer department on the separate and particu-
lar special assessment improvements.

It does not even need the further recitals of the

stipulation, that "Proceedings were thereafter had for the confirmation of new assessments, and in said proceedings it was adjudicated by the County Court that the city could not include in the new special assessment, or collect from the property owners, as part of the cost of the improvement, the items *which had been thus diverted from the particular special assessment fund 'Warrant No. 22,344' by the officers of the city of Chicago,* for the alleged expense of engineering, etc., amounting to $3,072.82, above referred to," to bring us to the conclusion that these sums were diverted from the trust fund in question here, and that the city should be charged directly with them in this proceeding. It does not matter whether the decision of the County Court is an adjudication for us of this question. It certainly decided the question before it as we should have expected it to do.

Seven thousand, two hundred and forty-six dollars and fifty-nine cents must be added to the amount for which the city is to be held chargeable on account of the principal of these last items. Under the rule which we have declared, as to the charge of interest, we think the city is properly accountable for it on this item also.

The counsel for appellant contend to the contrary, not only on the grounds on which they object to the allowance of interest on the abatement orders— grounds which we have hereinbefore disposed of—but because, they say, that at most if the transfer to other funds of this amount was illegal, it could be but a matter of bookkeeping, and that as the city had the money, in one fund or the other, it cannot be said to have made way with or converted it.

To allow the force of this argument to the full extent claimed for it by counsel, would be unwarrantably to give to the city the benefit of its own wrong. It, by its action, debited money on a particular date (December 31, 1906) from a trust fund, and credited it to non-trust funds, from which it proceeded to pay cor-

porate liabilities not properly chargeable to the specific trust fund. It was a notification to all concerned of the diversion of the money, which in the case of an individual trustee would charge him with interest from that date. It is an argument not without force, to say that the $7,246.59 was on that date of December 31, 1896, "wrongfully obtained" by the city, and should from that date bear interest. We do not wish to place our decision on that ground, however, and there is no showing in the stipulation of facts of the dates when this money was expended by the city for unauthorized purposes, and it cannot be said to have been "illegally withheld" because of its wrongful transfer on the city's books, until there was a default and demand in connection with the obligations on the trust fund. The sums belonged to the first instalment, and the first default shown by the record here was in the sum of $5,325.56 on July 24, 1899.

From the moment that this payment was refused, that amount, at least, was "illegally withheld." The next default was on $11,200, December 31, 1900. Our decision is that the city, on this portion of the fund, is chargeable with interest at five per cent. on $5,325.56 from July 24, 1899, to February 4, 1907, and on $1,-921.03 from December 31, 1900, to February 4, 1907. These items of interest are $2,005.20 and $585.37 respectively, which, added to $7,246.59, make $9,837.16. The amount for which we hold the city chargeable to the trust fund involved is therefore the sum of $979.97, $6,820.39 and $9,837.16—in the aggregate $17,637.42, and for this sum we think the city was answerable in this suit and under the stipulation on which it was tried as for money had and received. Its payment will not extinguish, except *pro tanto,* the outstanding obligations on the fund, for the tenth clause of the stipulation is: "This suit merely involves the plaintiff's claims against the city for payment of said vouchers, bonds and coupons, on account of the city's action in taking from and charging against the moneys collected

by it through said special assessment proceeding the sums of money above referred to in paragraphs three and four hereof *(i. e.,* the transfers to Fund W and the Sewer Fund), in allowing abatements to property owners as stated in paragraph five hereof, and in bidding in certain property at tax sale, as stated in paragraph seven hereof, *and is not to be considered as affecting any other rights or causes of action which the plaintiff may have or become entitled to."*

The amount for which the plaintiff was given judgment below was based on two computations, as we have indicated. The one which fixed the amount for which the city was answerable to the trust fund, we have shown, we think, was too much. That which fixed the amount due to the plaintiff on the obligations held by him, we think also too much, despite the stipulation as to its correctness, in that the interest on a voucher which bore no interest on its face has been calculated at six per cent. after maturity, five per cent. being the proper rate; because the same rate, excessive by one per cent., has been used in calculating interest on overdue coupons which provided for no rate on their face; and because interest, according to Exhibit A, was, in computing the amount of the judgment, plainly compounded from October 31, 1906, to January 3, 1907. But this is not material in our decision, because the amount computed to be due on the said obligations, after making all such allowances, would very considerably exceed the sum for which we hold the city chargeable.

If the plaintiff will, within ten days, remit on the judgment of the Circuit Court the sum of $2,538.75, we will affirm the same, and the balance will, of course, draw interest from its date below. If not, the judgment will be reversed and the cause remanded.

*Affirmed on remittitur.*

January 13, 1908, order of January 13, 1908, vacated by consent.

January 20, 1908, reversed and judgment here for $18,475, in favor of appellee.